UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROLANDO GUTIERREZ,<br><br>                          Petitioner,<br><br>v.<br><br>SCOTT KERNAN, Secretary,<br><br>                          Respondent. | Case No.:  17-cv-00438-MMA-MDD<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[ECF No. 1]** |

## I.    <u>INTRODUCTION</u>

This Report and Recommendation is submitted to United States District Judge Michael M. Anello pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

Rolando Gutierrez ("Petitioner"), a state prisoner proceeding *pro se*, seeks federal habeas relief from convictions for one count of second-degree murder (California Penal Code § 187(a)), one count of attempted second-degree murder (Cal. Pen. Code §§ 664, 187(a)), one count of making a criminal threat (Cal. Pen. Code § 422), and one count of corporal injury

resulting in a traumatic condition (Cal. Pen. Code § 273.5(a)).

After reviewing the Petition (ECF No. 1), Respondent's Answer and Memorandum of Points and Authorities in support thereof ("Answer") (ECF Nos. 15, 15-1), Petitioner's Traverse (ECF No. 21), supporting documents and pertinent state court Lodgments, the Court **RECOMMENDS** the Petition be **DENIED** for the reasons stated below.

## II.   <u>FACTUAL BACKGROUND</u>

### A. State Proceedings

"[A] determination of factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The following facts, taken from the California Court of Appeal's September 17, 2015, decision on direct review, (ECF No. 16-40 at 3-8), have not been rebutted with clear and convincing evidence and must be presumed correct. 28 U.S.C. § 2254(e)(1); *Slovik v. Yates*, 556 F.3d 747, 749 n.1 (9th Cir. 2009).

> In February 2009, defendant shot a gun a number of times into a group of people, killing Hannah Podhorsky (at times, February 2009 shooting). In August 2011, defendant threatened to kill Merith Duenas, the mother of their child, and choked and cut her with a knife (at times, August 2011 domestic violence).
>
> A. *The February 2009 Shooting*
>
> Witnesses at trial identified three gangs: the Wicked Clowns or "W.K" gang; the Stomping Klowns Around or "S.K.A." gang; and the Over Every Krew - 46th Street or "O.E.K. 46th Street" gang. In 2009, the S.K.A. gang and the O.E.K. 46th Street gang were friendly, and the W.K. gang and the O.E.K. 46th Street gang were not.
>
> Defendant and Juan Arredondo were members of the S.K.A. gang; Raymundo Hernandez, Jr., and Jesus Vargas were members of the O.E.K. 46th Street gang; and Angel Zamora and Podhorsky

were members of the W.K. gang. In addition to the specific gang-related events we describe *post* defendant and Zamora did not like each other personally, and there was an ongoing conflict or tension between them.

Duenas met defendant through her friend, Brittany Roachford, in January 2009. When Duenas first met defendant, he and Roachford were in an on-again-off-again romantic relationship, and the three of them would drink and do drugs, along with others who claimed to be in the S.K.A. gang.

Beginning late in the day on January 31, 2009, and progressing into the early morning hours on February 1, 2009, there were a number of confrontations between a group from the W.K. gang and another group from the O.E.K. 46th Street and the S.K.A. gangs.

A group of people associated with the W.K. gang, including Podhorsky, were at a party at the residence of Juan Meza; Zamora and two others left the party in Zamora's Nissan Xterra to get more beer; they drove by defendant's home, where a group of people were gathered, including defendant and Vargas; words were exchanged; when the Xterra returned, again driving by defendant's home, the W.K. gang members threw gang signs; and Vargas responded by throwing a rock that broke the window of Zamora's Xterra. Zamora felt disrespected; thus, after Zamora told the others at the Meza residence what had happened, a group of them, including Podhorsky, got back into the Xterra and returned to defendant's house. They parked in an alley close to defendant's house.

Meanwhile, Hernandez had been with friends at a house where O.E.K. 46th Street gang members often spent time. He left that house to attend a family birthday party for the parent of a friend who lived down the street - near the alley where Zamora and the other W.K. gang members had parked. While Hernandez and the guests were in the back yard at the birthday party, Hernandez heard the break of glass, and a group from the back yard went out front and saw the broken window of the car of one of the birthday party guests. Once out front, the group from the

party saw the six or seven people from the Zamora group (W.K. gang) on the street running toward the back of the house through the alley. At that point, the two groups - i.e., the Zamora group and the birthday party group - had a physical and verbal confrontation in the alley: fists, rocks and a bat were used, and Hernandez screamed out the name of his gang (O.E.K. 46th Street). The police arrived, and the members of the Zamora group split up and ran in various directions. After the police left, three of the W.K. gang members (including Zamora and Podhorsky) returned, got into the Xterra and drove back to the Meza residence, where the W.K. gang had been partying earlier.

After the melee in the alley, Hernandez returned to the house where he had been earlier that night before the birthday party. On the front sidewalk, he saw defendant and Vargas and told them what had just happened at the birthday party. Within minutes Roachford and Duenas drove up, having received a call shortly after midnight (now February 1) from defendant who needed a ride; defendant had told Roachford that he was concerned he was going to "get jumped." Although the record is not clear, we understand from Duenas's testimony that, on their way to pick up defendant, Duenas and Roachford drove by defendant's house, where they saw a group of people yelling and throwing rocks and sticks at the house. As defendant, Hernandez, Vargas, Arredondo, Duenas and Roachford all drove away together, defendant told the others about the earlier altercation with Zamora and the Xterra in front of defendant's house. Defendant stated that he "wanted to get" Zamora, because he thought Zamora had disrespected him during the events leading up to the earlier altercation. Hernandez understood defendant to mean that he wanted to fight Zamora.

They drove a few blocks, stopping briefly at the house of a friend of defendant. The friend handed defendant a gun wrapped in a bandana and told defendant to " 'do it for 46th.' " They then drove to various locations looking for Zamora. Defendant and Hernandez would get out of the car, look around and return to the car. As they were driving around, they saw Zamora's Xterra and followed it. By this point in time, defendant had a gun and had given Hernandez the gun in the bandana. Zamora parked the

4

Xterra in the driveway of the Meza residence, and Arredondo parked the other car on the street a few houses away.

Defendant asked Hernandez if he was " 'ready,' " which Hernandez understood to mean ready to "go shoot somebody." Zamora, Podhorsky and their friend were in the front yard of the Meza residence, as defendant and Hernandez got out of the car, each wearing a "hoodie" that covered his head and carrying a gun. As defendant and Hernandez walked up the sidewalk, Zamora heard someone yell " 'Fuck W.K.,' " followed by sound of gunshots. According to Hernandez, defendant stopped, raised his gun and shot it at least two times, and he (Hernandez) ran, never even trying to shoot his gun.

Two bullets passed entirely through Podhorsky's body. Podhorsky died from a gunshot wound to her torso.

## B. *The August 2011 Domestic Violence*

A few months after the February 2009 shooting, defendant and Duenas entered into a personal relationship, and they had a child together in February 2010.  Their relationship was a physically violent one.

On August 15, 2011, Duenas was at work, and her friends Bethany Fletcher and Leslie Lepe were at Duenas's house with Duenas's eight-year-old sister and Duenas's one-and-a-half-year-old child.  Lepe called Duenas to tell her that defendant had come to the house and threatened to kill Lepe and Fletcher.  Duenas immediately left work, and when she arrived at home, Lepe told Duenas that defendant's threat also included a return visit to kill her (Duenas).

As her friends were telling Duenas in more detail what had happened earlier, defendant returned.  He entered the house by jumping a fence to avoid a locked gate and opening a sliding glass door.  Defendant and Duenas argued, during which time defendant called Duenas a bitch, threatened to kill her, pulled out and opened a knife, cut her on her stomach, pushed her down to the ground and choked her with his hands.  After defendant cut

Duenas with the knife (and before he choked her), Lepe grabbed Duenas's child from Duenas, who had been holding the child throughout this ordeal. Duenas thought defendant was going to kill her, fully believing he was capable of doing so.

When Fletcher ran outside to call 911, defendant chased after her and pushed her into the bushes in his attempt to take her telephone. Defendant then left, threatening to kill all of them. Fletcher completed the 911 call, and the authorities arrived.

In addition to telling the authorities about the domestic violence events of that day, due to her fear of defendant - "I just thought he was going to kill me, too. I believed he was capable of it." - Duenas also told them what she knew about the February 2009 shooting. The authorities immediately placed Duenas in a battered women's shelter, eventually placing her in a witness protection program.

(ECF No. 16-40 at 3-8) (footnotes omitted).

On August 12, 2013, a San Diego Superior Court jury convicted Petitioner of the second-degree murder of Hannah Podhorsky (Cal. Pen. Code § 187(a)) and the attempted second-degree murder of another victim (Cal. Pen. Code §§ 664, 187(a)). (ECF No. 16-33 at 28-29). "As to both of these counts, the jury found true the following allegations: defendant committed the crimes as part of criminal street gang-related activities ([Cal. Penal Code] § 186.22(b)(1)); and defendant was a principal in the crimes, and in their commission at least one principal used a firearm, proximately causing a person's death ([Cal. Penal Code] § 12022.53(d), (e)(1))." (ECF No. 16-40 at 2). "In addition, from a domestic violence incident in August 2011, the jury convicted defendant of making a criminal threat ([Cal. Pen. Code] § 422) and corporal injury resulting in a traumatic condition ([Cal. Pen. Code] § 273.5(a)), but could not reach a verdict as to the attempted murder of Merith Duenas ([Cal. Pen. Code] §§ 664, 187(a)). As to the corporal injury count, the

jury found true the allegation that defendant personally used a deadly and dangerous weapon, a knife ([Cal. Pen. Code] §§ 12022(b)(1), 1192.7(c)(23))." (*Id.*). Petitioner was sentenced to a term of 65 years to life along with a consecutive term of ten years and four months.

On February 2, 2015, Petitioner filed an appeal in the California Court of Appeal, (ECF No. 16-37), arguing that "the trial court abused its discretion in not severing the charges arising from the February 2009 shooting from the charges arising from the August 2011 domestic violence incident." (ECF No. 16-40 at 2). The Court of Appeal affirmed the superior court's judgment. (ECF No. 16-40 at 2). On October 26, 2015, Petitioner filed a Petition for Review in the California Supreme Court. (ECF No. 16-41). The California Supreme Court denied review on December 9, 2015. (ECF No. 16-42).

On November 14, 2016, Petitioner filed a Petition for Writ of Habeas Corpus with the San Diego Superior Court. (ECF No. 16-47). Petitioner raised four claims: (1) improper admission of gang evidence; (2) insufficient evidence to establish Cal. Penal Code § 186.22; (3) ineffective assistance of trial counsel; and (4) ineffective assistance of counsel on appeal. (*Id.*). The San Diego Superior Court denied habeas relief on December 12, 2016. (ECF No. 16-44). On January 25, 2017, Petitioner filed a habeas petition with the California Court of Appeal (Fourth District, Division 1), (ECF No. 16-45), which denied habeas relief on February 3, 2017, (ECF No. 16-46). On February 16, 2017, Petitioner filed a habeas petition in the California Supreme Court, (ECF No. 16-47), which denied habeas relief on April 19, 2017. (ECF No. 16-48).

///
///
///

## B. Federal Proceedings

On February 24, 2017, Petitioner, proceeding *pro se*, constructively filed the instant Petition for Writ of Habeas Corpus. (ECF No. 1). The Petition sets forth the claim raised on direct review and the four claims raised on habeas review: (1) improper joinder of counts; (2)(A) improper admission of gang evidence; (2)(B) insufficient evidence to establish Cal. Penal Code § 186.22; (3) ineffective assistance of trial counsel; and (4) ineffective assistance of appellate counsel. (ECF No. 1 at 6-9). On March 13, 2017, Petitioner constructively filed a motion to amend the second, third, and fourth grounds for relief in his Petition to show that they were exhausted. (ECF No. 10 at 1). This Court granted the Motion to Amend his Petition on May 17, 2017. (ECF No. 14). On May 19, 2017, Respondent filed an Answer, (ECF No. 15), and Memorandum of Points and Authorities In Support of Answer, (ECF No. 15-1). On July 16, 2017, Petitioner filed a Traverse and Memorandum of Points and Authorities in Support of Traverse. (ECF No. 21).

## III. <u>STANDARD OF REVIEW</u>

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Under § 2254(d), federal habeas relief for a claim adjudicated on the merits in state court is granted if the state court adjudication of the claim either: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The petitioner carries the burden of

proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

In other words, "if the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to § 2254(d) set out in §§ 2544(d)(1) and (2) applies." *Richter*, 562 U.S. at 103. "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt[.]'" *Pinholster*, 563 U.S. at 181; *White v. Woodall*, 134 S.Ct. 1697, 1702 (2014) ("This standard, we recently reminded the Sixth Circuit, is difficult to meet.") (internal quotations omitted).

The state court's decision is "contrary to" clearly established federal law if it either "'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (O'Connor, J., concurring)).

The state court's decision is "an unreasonable application" of clearly established federal law "if 'the state court identifies the correct governing legal principle' but applies the principle unreasonably to the prisoner's factual situation." *Holley*, 568 F.3d at 1098 (quoting *Williams*, 529 U.S. at 413).

"The 'unreasonable application' clause requires the state decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Relief under § 2254(d)(1)'s "unreasonable-application clause" is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded

disagreement' on the question." *Woodall*, 134 S.Ct. at 1706-07 (quoting *Richter*, 562 U.S. at 103).

"'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" *Woodall*, 134 S.Ct. at 1702 (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012)). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer*, 538 U.S. at 71-72. "Circuit precedent may not serve to create established federal law on an issue the Supreme Court has not yet addressed." *Holley*, 568 F.3d at 1097. As such, "[i]f there is no Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law." *Stevenson v. Lewis*, 384 F.3d 1069, 1071 (9th Cir. 2004).

Federal courts review the last reasoned decision from the state courts. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804-06 (1991); *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

## IV. **DISCUSSION**

### A. **Claim One: Improper Joinder**

In claim one, Petitioner claims he was denied his right to an impartial jury, a fair trial, and due process when the trial court denied his motion to sever the two sets of charges: the 2009 murder and attempted murder and

the 2011 domestic violence incident.  (ECF No. 1 at 37, 43).

### 1. State Court Opinion

Petitioner raised claim one in his petition for review to the state appellate and supreme courts.  (ECF Nos. 16-37, 16-41).  The appellate court denied Petitioner's claim on the merits and the California Supreme Court denied the petition without comment or citation to authority.  (ECF Nos. 16-40, 16-42).  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for authority.  *Ylst.* 501 U.S. at 805-06.  That court wrote:

> Defendant first argues that the court erred in denying severance under section 954 during the *pretrial proceedings*.  Defendant then argues that, even if the court did not err in denying severance, he nonetheless suffered prejudice *at trial* as a result of the joinder of the charges.

> ### 1. Defendant Did Not Meet His Burden of Establishing That the Trial Court Abused its Discretion in Denying Severance

> There is no issue on appeal with regard to whether the murder counts and the domestic violence counts are "of the same class of crimes or offenses" (§ 954), which means " ' "offenses possessing common characteristics or attributes." ' "  Defendant made no showing to the contrary in his opening brief, the People persuasively argue that both sets of charges are of the same class—namely, assault—and in reply defendant concedes that they "are of the same class and permissibly joined under section 954."

> We now turn to defendant's showing of prejudice in the context of the four factors (1) whether the evidence from the domestic violence counts would be cross–admissible in separate trials, (2) whether some of the charges might inflame the jury, (3) whether the People joined a weak case with a strong case to such an extent that a spillover effect might affect the outcome, and (4) whether one of the joined charges is a capital crime.  Not all of these factors are of equal weight; we are to look *first* whether the evidence is cross-admissible.  If " ' "evidence on each of

the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others," ' " then " ' " *any inference of prejudice is dispelled.*" ' " Thus, cross-admissibility of the evidence " 'suffices to negate prejudice' " without a further showing.

Here, the court did not abuse its discretion in ruling that, because Duenas was a critical witness on the murder counts and thus her credibility would be at issue, the evidence relating to the domestic violence counts was "inextricably intertwined" with the evidence on the murder counts. Because neither side submitted *evidence* in support of or in opposition to either the written or oral motion, the court necessarily relied on argument.

In the written opposition, the People argued:

"[E]vidence of Defendant Gutierrez['s domestic violence] attack on Ms. Duenas would be independently relevant to the murder charges insofar as it explains why Ms. Duenas revealed what she knew to the police nearly 2 ½ years after [the shooting] occurred. Furthermore, the crimes from 2011 would be independently relevant to fully explain and justify the witness protection efforts made and resources expended on Ms. Duenas."

Consistently, at the hearing, the district attorney orally argued:

"[E]vidence of Merith Duenas's violence at the hands of defendant Gutierrez will come in in [sic] a trial on [the murder counts].... It is and can only be described as significantly relevant to her state of mind both at the time she was making the statement to the cops immediately following her report of injury done to her by defendant Gutierrez, as well as highly relevant to her fear of him, her state of mind now as she testifies, and her potential prejudices or biases against him."

"This is a case in which her testimony ... will be carefully scrutinized by the jury.... [T]hey will wonder what made her do this so far after the event. She did not immediately report. This occurred two years after she should have reported. Why did she all of a sudden report? Why should we believe her now that she's coming forward and talking to the police?"

> *"And that question can only be answered and the jury can only be fairly apprised of the actual circumstances if, in fact, ... the [jury that hears the murder charges ] learns of the circumstances of her discussion with the police on August 15, 2011, which is after she was attacked by defendant Gutierrez."*

Significantly, defendant does not argue that this showing was inadequate to establish the cross–admissibility of the evidence of the domestic violence. Rather, he argues only that the premise of the People's argument—namely, that Duenas did not come forward for two and a half years because of her fear of violence by defendant—was faulty. Relying on Duenas's recorded interview with the police on August 15, 2011 (the date of the domestic violence), defendant explains that Duenas did not come forward after the shooting because she feared she would be charged and sent to prison, not because she was afraid of defendant. On appeal, defendant quotes from portions of Duenas's recorded interview that support his contention on appeal. Defendant's argument fails for two reasons. First, the parties did not submit the transcript to the trial court with their written submissions, and there is no indication that the court otherwise had before it Duenas's recorded interview, yet we must review the court's decision based only on what it knew *at the time of the ruling*. Moreover, even if we assume the court had read and considered the recorded interview, in addition to those portions on which defendant relies, Duenas's statement also contains substantial evidence in support of the court's ruling on cross-admissibility—namely, Duenas's genuine concern for her safety and that of her child, and specifically her fear of defendant, given his violent behavior toward her.

Having found no abuse of discretion in the trial court's ruling in response to defendant's written pretrial motion, we next consider defendant's renewed motion to sever. Defendant orally renewed his motion during the in limine proceedings at which the court decided whether uncharged acts of domestic violence against Duenas would be admissible under Evidence Code section 1109. Following the hearing, the court issued a written ruling, allowing evidence of three uncharged acts, disallowing two uncharged acts, and ruling as following on defendant's renewed request to sever:

"The court does not believe that the foregoing ruling on the admissibility of [the evidence on the three] uncharged acts [ ] going to [the domestic violence counts] materially changes its previous analysis and ruling on the earlier motion to sever these counts.  An appropriate limiting instruction is invited, and it seems highly likely that the trial of [the murder counts], even if severed, would involve evidence of the tumultuous relationship between Merith Duenas and defendant."

We agree.  The admissibility of three uncharged acts of domestic violence, especially with an appropriate limiting jury instruction, does not change the court's earlier ruling that the evidence of domestic violence was "inextricably intertwined" with the evidence on the murder counts and, thus, cross–admissible.  Once again, the court did not abuse its discretion.

Because the court properly determined, on the pretrial record before it, that the evidence in support of the domestic violence counts would be admissible against defendant in a separate trial on the murder counts, we are satisfied that " ' "*any inference of prejudice is dispelled.*" ' "  Accordingly, we need not consider the other three factors that may establish prejudice.

For these reasons, defendant did not meet his burden of establishing error in the denial of the motions to sever.

## 2. *Defendant Did Not Meet His Burden of Establishing Prejudice at Trial*

Defendant argues that, even if the trial court did not err in denying his pretrial requests to sever the murder counts from the domestic violence counts, the joinder of the charges at trial resulted in prejudice—i.e., " ' "in gross unfairness depriving [the] defendant of due process," ' " quoting from *Soper, supra,* 45 Cal.4th at page 783.  In so arguing, defendant again focuses on strength of the evidence in support of the domestic violence charges, including the evidence of the uncharged acts of violence admitted pursuant to Evidence Code section 1109, and on what he contends is the weakness of the evidence in support of the murder charges.  We are not convinced.

14

For purposes of this analysis, we must assume that the evidence in support of the domestic violence charges would not have been admissible in a separate trial on the murder charges. In so doing, however, there will be no prejudicial effect from the joinder of charges " ' "when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials." ' "

Even without consideration of defendant's acts of domestic violence, the evidence of defendant's guilt of murder of Podhorsky and attempted murder of another was strong. Defendant had a longstanding feud with Zamora; and defendant's gang, the S.K.A. gang, did not get along with Zamora's (and Podhorsky's) gang, the W.K. gang. After Zamora, Podhorsky and their friend returned to the Meza residence, parked the Xterra in the driveway and were standing in the front yard, *five eyewitnesses* saw defendant and Hernandez—each with a gun—walk toward the Meza residence as gunshots were heard and sparks of light were seen. *One eyewitness* saw defendant shoot his gun, and *another eyewitness* was "pretty sure" she saw defendant shoot his gun. When defendant and Hernandez returned to their car, Hernandez had not fired his gun. As she stood in the front yard of the Meza residence, Podhorsky was shot twice.

In contrast, defendant presented an alibi defense, the only evidence of which came from defendant's 18–year–old brother (who was 13 at the time of the February 2009 shooting). The brother testified that he and defendant shared a bedroom and that, when the brother went to bed at 12:30 a.m., a few hours before Podhorsky's killing, defendant was already in home in bed, and they woke up together at around 5:00 a.m. a few hours after Podhorsky's killing. Although defendant emphasizes that his brother's testimony was "compelling and unimpeached" (and tells us all the reasons the prosecution witnesses were not credible and how well they had been impeached on cross-examination), the jury was not required to give the brother's testimony any special consideration (or the People's witnesses any less consideration). The jury was instructed properly according to CALCRIM No. 226, in part as follows: "*You may believe* all, or part or *none of any witness's testimony*. Consider the testimony of each witness and decide how much of it you believe.

In evaluating a witness's testimony you may consider anything

15

that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are these: [¶] ... [¶] Was the witness's testimony influenced by a factor such as bias or prejudice, *a personal relationship with someone involved in the case,* or a personal interest in how the case is decided?"

Thus, the jury was entitled to consider the familial relationship between defendant and his alibi witness in assessing the alibi defense that defendant proffered through his brother's testimony.

In closing, defendant argues that the introduction of evidence of domestic violence—both the charged acts and the uncharged acts—was so prejudicial that it violated his federal constitutional rights to due process, rendering the trial fundamentally unfair. "To prove a deprivation of federal due process rights, [an appellant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are *no permissible inferences the jury may draw from the evidence* can its admission violate due process.'" Defendant did not meet this high constitutional standard.

Defendant contends that the jury was "not limited in the manner they could consider the evidence of the *charged* counts of domestic violence"—suggesting that a jury cannot be expected "to compartmentalize the evidence ... when they are not told to do so." We disagree. In the trial of the murder counts, the jury could permissibly infer from the evidence of the charged counts of domestic violence both Duenas's credibility and the reason for her delay in reporting.

For the first time in his reply brief, in the context of the *uncharged* acts of domestic violence and CALCRIM No. 852, defendant contends that "the jury was told they [*sic*] could consider the domestic violence to conclude that [defendant] had a propensity to commit acts causing serious bodily injury, i.e. [,] murder and attempted murder, as charged in counts 1 and 2." Defendant forfeited this claim by not raising it in his opening brief. In any event, we further reject the argument on the basis that, in presenting it, defendant misrepresents the record in describing what the jury was told insofar as considering the uncharged acts of domestic violence. Contrary to defendant's presentation quoted *ante,* the jury was told *both* that it could (but was

not required to) consider the uncharged acts of domestic violence for purposes of determining guilt in "counts 3, 4 and/or 5 as charged in this case" *and* that it could "not consider this evidence for any other purpose," which includes the murder charges in counts 1 and 2. We presume, and defendant does not argue otherwise, that the jury understood and followed this instruction.

(ECF No. 16-40 at 12-20) (internal citations and footnotes omitted).

### 2. Summary of Arguments

Petitioner contends that the prejudicial misjoinder of charges deprived him of due process. In doing so, Petitioner argues "[d]espite [Petitioner]'s strong defense to the murder charges, the jury heard extensive, inflammatory evidence of his abuse of Duenas—where his identity was uncontested— tipping the scales in favor of conviction. Joinder deprived [Petitioner] of due process, requiring reversal." (ECF No. 1 at 48).

Respondent argues that the severance claim is not cognizable in habeas corpus proceedings and that the claim was reasonably rejected by the state court. (ECF No. 15-1 at 16, 17).

### 3. Legal Standard

"If there is no Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law." *Stevenson*, 384 F.3d at 1071. Moreover, "[t]he Supreme Court has never held that a trial court's failure to provide separate trials on different charges implicates a defendant's right to due process." *Hollie v. Hedgpeth*, 456 Fed.Appx. 685, 685 (9th Cir. 2011).

### 4. Analysis

Although Petitioner provides numerous federal appellate cases to support his argument, none are relevant simply because they are not Supreme Court cases. (ECF Nos. 1, 21 at 37-48, 6-8). The only Supreme

Court precedent Petitioner provides is a footnote in *United States v. Lane*, 474 U.S. 438 (1986). (ECF Nos. 1, 21 at 43, 6). Petitioner cites footnote 8 in *Lane* for the proposition that "misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." (ECF No. 1 at 44). Petitioner's argument, however, fails as the Ninth Circuit has "found that the statement in *Lane* regarding when misjoinder rises to the level of constitutional violation was dicta[.]" *Runningeagle v. Ryan*, 686 F.3d 758, 776 (9th Cir. 2012). Consequently, the *Lane* decision is not "'clearly established Federal law' sufficient to support a habeas challenge under § 2254." *Id.* at 777.

Accordingly, the Court **RECOMMENDS** claim one be **DENIED**.

## B. Claim Two: Insufficiency of Evidence & Improperly Admitted Evidence

Petitioner raises two separate issues under claim two. Petitioner contends that the evidence presented at trial was insufficient to prove criminal street gang allegation pursuant to California Penal Code § 186.22(b)(1).[1] (ECF No. 1 at 51). Petitioner also contends the admission of gang evidence, specifically Detective Damon Sherman's expert testimony regarding gang evidence, so fatally infected the proceeding as to render them fundamentally unfair, violating Petitioner's right to a fair trial and due process under the Fifth and Fourteenth Amendments.[2] (ECF No. 1 at 49, 52). Petitioner argues that Detective Sherman's testimony should have been excluded because its probative value is substantially outweighed by its

---

[1] This issue will be referred to as "insufficiency of evidence claim".
[2] This issue will be referred to as "improperly admitted evidence claim".

Case No.: 17-cv-00438-MMA-MDD

prejudicial effect. (*Id.* at 49, 51). Respondent has plead procedural default as an affirmative defense to both of these claims. (ECF No. 15-1 at 18-19).

As will be discussed below, the insufficiency of evidence claim requires only a procedural default analysis while the improperly admitted evidence claim requires both a procedural default analysis and an analysis on the merits.

### 1. State Court Opinion

Petitioner raised both claims in his habeas petitions to the state superior, appellate, and supreme courts. (ECF Nos. 16-43, 16-45, 16-47). Both the superior and appellate courts denied Petitioner's claims on the merits. (ECF Nos. 16-44, 16-46). The California Supreme Court denied the petition without comment or citation to authority. (ECF No. 16-48). Accordingly, this Court must again "look through" to the state appellate court's order denying the claims as the basis for authority. *Ylst*, 501 U.S. at 805-06. That court wrote:

> Gutierrez now raises four new contentions challenging his conviction. First, he contends the trial court allowed evidence concerning his gang affiliation to be admitted despite its prejudicial nature. This claim is not cognizable at this stage because the writ of habeas corpus does "not lie to review questions concerning the admissibility of evidence." *(In re Harris* (1993) 5 Cal.4th 813,826; accord, *In re Lindley* (1947) 29 Cal.2d 709, 723.)

> Second, Gutierrez claims the evidence was insufficient to support the gang allegations. Just as with his first contention, "claims of the insufficiency of evidence to support [his] conviction[s] are not cognizable in a habeas corpus proceeding." *(In re Reno* (2012) 55 Cal.4th 428, 505.)

(ECF No. 16-46).

///

///

### 2. Legal Standard - Procedural Default

Under the procedural default doctrine, federal habeas review of a federal claim "is barred unless the petitioner can demonstrate cause for procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003) (internal quotations omitted).

The procedural default doctrine prohibits federal court review of state court rulings where: (1) the petitioner violated an applicable state procedural rule, *Coleman*, 501 U.S. at 750; (2) the procedural violation is "an adequate and independent state law basis on which the state court can deny" petitioner's federal constitutional claim, *Bennett*, 322 F.3d at 580; (3) the highest state court "clearly and expressly rel[ied]" on the procedural default, *Coleman*, 501 U.S. at 735; and (4) the state "adequately ple[a]ds the existence of an independent and adequate state procedural ground as an affirmative defense," *Bennett*, 322 F.3d at 586.

If the state adequately pleads the affirmative defense, "the burden to place that defense in issue shifts to the petitioner." *Id.* "The petitioner may satisfy this burden by asserting factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." *Id.*

### a. The Insufficiency of Evidence Claim is Procedurally Defaulted.

Here, Respondent has plead procedural default as an affirmative defense to Petitioner's insufficiency of evidence claim. (ECF No. 15-1 at 18-19). Respondent observes the court of appeal held that Petitioner's "sufficiency-of-the-evidence claim w[as] not cognizable in habeas corpus

proceedings under California law." (*Id.* at 19).

The court of appeal clearly and expressly relied on *In re Reno* which reiterated the *Lindley* rule. (ECF No. 16-46 at 1). *See Carter v. Giurbino*, 385 F.3d 1194, 1196 (9th Cir. 2004) ("*Lindley* stands for the California rule that a claim of insufficiency of evidence can only be considered on direct appeal, not in the habeas proceedings."). Additionally, Respondent stated that the *Lindley* rule is "adequate and independent," citing *Carter*. (ECF No. 15-1 at 20). *See Carter*, 385 F.3d at 1196 ("Because the California Supreme Court actually relied on *Lindley*, an independent and adequate state procedural bar, the district court correctly held that Carter's sufficiency of the evidence claims were procedurally defaulted."). Absent from the Petition are any arguments or allegations that attempt to demonstrate: (1) the inadequacy of the rule; (2) the inconsistent application of the rule; (3) that there is cause and prejudice for the default; or (4) that the failure to consider the claim will result in a fundamental miscarriage of justice.

Because Respondent has shown that the highest state court clearly and expressly relied on the *Lindley* rule as an adequate and independent state ground to bar Petitioner's federal constitutional claim, Respondent has satisfied the burden of adequately pleading procedural default as an affirmative defense. Further, because Petitioner failed to demonstrate that the bar is inadequate or inconsistently applied, that there is cause and prejudice for the default, or that there is a fundamental miscarriage of justice, Petitioner has not satisfied his burden to overcome the affirmative defense.

Accordingly, the Court **RECOMMENDS** the insufficiency of evidence claim be **DENIED**.

///

## b. The Improperly Admitted Evidence Claim is Not Procedurally Defaulted.

Respondent has plead procedural default as an affirmative defense to Petitioner's improper admission of evidence claim. (ECF No. 15-1 at 18-19). The court of appeal held that Petitioner's admissibility-of-evidence claim is not cognizable because habeas corpus does not extend to reviewing questions concerning the admissibility of evidence. (ECF No. 16-46 at 1). The court of appeal cited *In re Harris* and *In re Lindley*. (*Id.*). Respondent claims that, under *In re Harris* and *In re Lindley*, this bar is "adequate and independent" citing *Carter*. (*Id.*). Beyond citing *Carter*, Respondent does not demonstrate this bar is actually adequate and independent.

As discussed above, *Carter* only held that the *Lindley* rule regarding insufficiency of evidence was an independent and adequate procedural state bar. *See Carter*, 385 F.3d at 1196 ("Because the California Supreme Court actually relied on *Lindley*, an independent and adequate state procedural bar, the district court correctly held that Carter's sufficiency of the evidence claims were procedurally defaulted."). *Carter* does not hold that the procedural state bar for claims of admissibility of evidence is an adequate and independent state procedural ground.

Accordingly, Respondent has failed to prove the independent and adequate elements of the procedural default doctrine, and therefore fails to adequately plead procedural default for Petitioner's improperly admitted evidence claim. Accordingly, the Court will next address the merits of the claim.

///

///

///

### 3. Legal Standard – Improper Admission of Evidence

"Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law, as laid out by the Supreme Court." *Holley,* 568 F.3d at 1101 (quoting 28 U.S.C. § 2254(d)). "If there is no Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law." *Stevenson*, 384 F.3d at 1071.

### a. Analysis

"The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process" and "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley,* 568 F.3d at 1101 (quoting 28 U.S.C. § 2254(d)). Additionally, the Supreme Court has not held that due process is violated by "the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact." *Moses v. Payne*, 555 F.3d 742, 761-62 (9th Cir. 2009); *see also Briceno v. Scribner*, 555 F. 3d 1069, 1078 (9th Cir. 2009) ("Our recent decision in *Moses* forecloses" the claim that trial court deprived petitioner of due process and fair trial when it admitted a gang expert's testimony that crimes in question were gang-related, "as it holds that there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue."), *overruled on other grounds as recognized in*, *Emery v. Clark*, 643 F.3d 1210, 1215 (9th Cir. 2011).

Because of the absence of Supreme Court precedent controlling the legal issue raised by Petitioner in state court, the state court's ruling was not

contrary to, or an unreasonable application of, clearly established Federal law.

Accordingly, the Court **RECOMMENDS** the improperly admitted evidence claim be **DENIED**.

## C. Claim Three: Ineffective Assistance of Trial Counsel

Petitioner contends in claim three that he received ineffective assistance of counsel because his trial counsel: (1) failed to consult an expert toxicologist; (2) failed to object to the admission of a text message into evidence; and (3) failed to call certain witnesses. (ECF No. 1 at 53-56).

### 1. State Court Opinion

Petitioner raised claim three in his habeas petitions to the state superior, appellate, and supreme courts. (ECF Nos. 16-43, 16-45, 16-47). Both the superior and appellate courts denied Petitioner's claim on the merits. (ECF Nos. 16-44, 16-46). The California Supreme Court denied the petition without comment or citation to authority. (ECF No. 16-48). Accordingly, this Court again "looks through" to the state appellate court's order denying the claims as the basis for authority. *Ylst*, 501 U.S. at 805-06. That court wrote:

> Third, Gutierrez claims his trial counsel was ineffective for failing to find an expert toxicologist, failing to object to the introduction of a text message, and failing to call two witnesses. To establish ineffective assistance of counsel, Gutierrez must demonstrate deficient performance and prejudice under an objective standard of reasonable probability of an adverse effect on the outcome. *(People v. Waidla* (2000) 22 Cal.4th 690, 718.)
>
> To establish ineffective assistance of counsel for failure to investigate potential evidence for a trial, like finding an expert witness, a petitioner "must establish the nature and relevance of the evidence that counsel failed to present or discover." *(People v. Williams* (1988) 44 Cal.3d 883,

937.) Further, the defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*Ibid*.) Here, Gutierrez simply presents conclusory and speculative assumptions about what a toxicologist *might* have testified about, with no actual evidence that such expert opinion testimony could be elicited.

With the other two witnesses, Gutierrez provides declarations consisting of their potential testimony, but both declarations provide only vague standards that do not suggest, even if these witnesses had testified at trial, that there is a reasonable probability of any effect on the outcome of trial. Similarly, even assuming it was error to not object to the introduction of a text message, it is not reasonably probable that counsel's failure to object prejudiced Gutierrez.

(ECF No. 16-46 at 2).

## 2. Legal Standard

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Baylor v. Estelle*, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that *Strickland* "has long been clearly established federal law determined by the Supreme Court of the United States"). In order to be granted habeas relief for a claim of ineffective assistance of counsel, Petitioner must show both that "[1] his counsel provided deficient assistance and [2] that there was a prejudice as a result." *Richter*, 562 U.S. at 104. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

To establish deficient performance, Petitioner "must show that

'counsel's representation fell below an objective standard of reasonableness.'" *Richter*, 562 U.S. at 104 (2011) (quoting *Strickland*, 466 U.S. at 688). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* "The [Petitioner]'s burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id.* at 104 (quoting *Strickland*, 466 U.S. at 687).

"With respect to prejudice, [Petitioner] must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome.'" *Id.* at 104 (quoting *Strickland*, 466 U.S. at 694). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting *Strickland,* 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). Consequently, "a court making the prejudice inquiry must ask if the [Petitioner] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 696. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695.

///
///
///
///
///

### 3. Analysis

#### a. Failure to Obtain Expert Toxicologist

Petitioner argues that, because three of the state's witnesses (Raymundo Hernandez, Jesus Vargas, and Merith Duenas) testified to using drugs, trial counsel's failure to obtain an expert toxicologist to testify to the drug's cognitive effects rendered trial counsel ineffective. (ECF No. 1 at 53-54). Furthermore, Petitioner argues expert toxicologist testimony was necessary to "make clear why there were so many inconsistencies and the credibility, if any, of the [state's] witnesses." (*Id.* at 54). Petitioner alleges the absence of an expert toxicologist "allowed [the] prosecutor to present uncontested testimony, which deprived petitioner of effective assistance of counsel and due process." (*Id.*).

The record neither supports Petitioner's allegation that these witnesses presented uncontested testimony, nor does it demonstrate a necessity for an expert to explain the impact drugs and alcohol had on the state's witnesses. In fact, Jesus Vargas explicitly testified on direct examination that his inability to remember what happened on the night of the shooting was because he was drunk. (ECF No. 16-25 at 148). On more than one occasion during cross examination, Petitioner's trial counsel elicited testimony from Vargas that, while he did not know how much he drank, his inability to remember many of the details from the night was because he was "pretty wasted." (*Id.* at 783-788). Merith Duenas testified regarding the impact ecstasy has on her. (ECF No. 16-24 at 411-412). Raymundo Hernandez was questioned on both direct and cross examination about his drug use and inconsistencies in the statements he made at trial with statements that he made before trial. (ECF No. 16-27 at 142, 186).

As such, trial counsel's failure to call an expert toxicologist is not

deficient performance as the jury would have been capable of evaluating the witnesses' testimony without an expert's opinion. Even assuming Petitioner did establish deficient performance, Petitioner fails to demonstrate, in light of the testimony from Hernandez, Vargas, and Duenas, a reasonable probability that an expert toxicologist's testimony would have affected the jury verdict.

Because Petitioner fails to demonstrate both how trial counsel's decision to not obtain the testimony of an expert toxicologist constituted deficient performance and how obtaining such testimony would have changed the result of the proceeding, Petitioner fails to satisfy both prongs of the *Strickland* test.

Accordingly, the state court's application of clearly established federal law was not objectively unreasonable.

### b. Failure to Object to Text Message

Petitioner argues that failure to object to the introduction of a threatening text message, from Petitioner to Duenas, "rendered counsel ineffective", (ECF Nos. 1, 21 at 54, 11), and "was also prejudicial." (ECF No. 1 at 54). In his Traverse, Petitioner argues "[t]his was a threatening text message and Petitioner was cnvicted [sic] for criminal threats. Counsel's failure to object rendered herself ineffective." (ECF No. 21 at 11).

Respondent argues Petitioner's "contention that Investigator Syzmonik's reference to a threatening text message was grounds for a mistrial is without merit." (ECF No. 15-1 at 27). In doing so, Respondent contends:

> "[I]n light of the context of Investigator's Syzmonik's testimony, that is, Merith Duenas' placement in the witness protection program because of her fear of [Petitioner], mention of a text message was of no moment. This was particularly true because the jury heard the details of [Petitioner]'s violent treatment of Duenas, including his pulling a knife

28

and threatening to kill her, and when his attempt to stab her was foiled, he knocked her to the ground, put his knee on her chest, and choked her. The mention of a generically threatening text message could not have been prejudicial."

(*Id.*).

Although Investigator Syzmonik testified Duenas was placed in the witness protection program because Duenas received a threatening text message, Investigator Syzmonik did not testify about who sent the message or what the message specifically said. (ECF. No. 16-22 at 154-156). Assuming the failure to object was in error, Petitioner fails to demonstrate that but for counsel's failure to object, the result of the proceeding would have been different. Petitioner has failed to establish how mention of the text message, without mentioning that Petitioner sent the text or the contents of the text, prejudiced Petitioner.

Because Petitioner has not demonstrated a reasonable probability that the result of the proceeding would have been different if trial counsel had objected to the testimony, Petitioner has failed to satisfy the prejudice prong of the *Strickland* test.

Accordingly, the state court's application of clearly established federal law was not objectively unreasonable.

### c. Failure to Call Witnesses

Petitioner also claims failure to call two witnesses, Jesus Osorio Ramirez and Cesar Rivera, "rendered counsel ineffective and prejudiced petitioner's defense." (ECF No. 1 at 55). In support of this claim, Petitioner submits declarations from each person. (*Id.* at 62-66).

Respondent contends this claim should be denied since the state court's rejection of this claim was in accord with and a reasonable application of clearly established federal law. (ECF No. 15-1 at 27). Respondent argues

that Petitioner's "self serving assertions fail to meet his burden to overcome the strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance." (*Id.*).

To establish prejudice caused by the failure to call a witness, Petitioner must show that "the witness was likely to have been available to testify; that the witness would have given the proffered testimony; and that the witnesses' testimony would have created a reasonable probability that the jury would have reached a verdict more favorable to the Petitioner." *Mitchell v. Ayers*, 309 F.Supp.2d 1146, 1155 (N.D.Cal.2004) (citing *Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003)).

### i. Mr. Ramirez

Petitioner argues that Mr. Ramirez, Petitioner's father, would have impeached Raymundo Hernandez's testimony about events that occurred shortly before the shooting on the February 2009 shooting. As the trial court noted:

> "The declaration of Mr. Ramirez describes a sequence of events that occurred shortly before the February 2009 shooting, but it contains no description of events during the time period when the shooting occurred. Assuming everything in this declaration is true, *it would not point to Petitioner's innocence*. The declaration does not contradict the evidence presented at trial that indicated that the shooting occurred sometime after the sequence of events described by Mr. Ramirez."

(ECF No. 16-44 at 5) (emphasis added).

Additionally, Petitioner fails to satisfy his burden of showing the witness would have given the proffered testimony. Mr. Ramirez's declaration does not state what Petitioner claims Mr. Ramirez would testify about. While the Traverse states Mr. Ramirez would testify that Mr. Ramirez was the "good samaritan who stopped Mr. Hernandez and another from beating Ms. Podhorsky," Mr. Ramirez's declaration does not state that he stopped any

altercation.  (ECF Nos. 21 at 10, 16-43 at 42).  Rather, it states that Mr. Ramirez was "in front of his house" when he saw "[t]he girl who lied on the floor after being kicked and punched various times stood up and ran with everybody else[.]"  (ECF No. 16-43 at 42).  As such, it cannot be established that Mr. Ramirez would have given the proffered testimony.

In short, the declaration has minimal probative value, if any.  Therefore, Petitioner has failed to demonstrate that the testimony would have created a reasonable probability that the jury would have reached a verdict more favorable to Petitioner.  Accordingly, because Petitioner has failed to satisfy the prejudice prong of the *Strickland* test, the state court's application of clearly established federal law was not objectively unreasonable.

### ii.  Mr. Rivera

Petitioner also argues that Mr. Rivera would have impeached the testimony of Merith Duenas, Leslie Lepe, and Bethany Fletcher.  (ECF No. 1 at 55).  Mr. Rivera's testimony, Petitioner claims, "would also show that, state witnesses, Bethany Fletcher, Merith Duenas, and Leslie Lepe, fabricated their stories in order to incriminate petitioner."  (*Id.*).  Petitioner submitted a declaration from Mr. Rivera.  (*Id.* at 66).  The declaration Petitioner submitted to this court and to the court of appeal, however, is not the same declaration he submitted to the state superior court.  (ECF Nos. 16-45 at 49, 16-43 at 46).  It appears that Petitioner was attempting to cure what the superior court found to be defective in the declaration, such as the date and time of the events described.  (ECF No. 16-44 at 5) ("The declaration has no reference to date or time, therefore there is no way of knowing if the event described is the same event in which the domestic violence occurred.").

The description of events in the new declaration expressly contradict

the events as described in the first.  The first declaration states that "Meredith [sic] walked out of the apartment pulling Rolando by his jean's belt loop.  She was being hysterical and threatening about the camera.  They made their way to the middle of the street until Rolando threw the camera far away so we could leave while she was getting it."  (ECF No. 16-43 at 46).  The second declaration states "Rolando came out running from the apartment with Merith chasing behind him and hitting[.] With all the hits Rolando dropped the camera and got into my vehicle and we left.  Another person who can declare or be a witness to this is Merith Duenas friend who was running behind both Rolando and Merith."  (ECF 1 at 66).

As Petitioner's declarations contradict each other, Petitioner has not met his burden.  Petitioner has not shown that: (1) the witness would have given the proffered testimony; and (2) the testimony would have created a reasonable probability that the jury would have reached a verdict more favorable to the Petitioner.  Because Petitioner has failed to satisfy the prejudice prong of the *Strickland* test, the state court's application of clearly established federal law was not objectively unreasonable.

Accordingly, the Court **RECOMMENDS** claim three be **DENIED**.

## D. Claim Four: Ineffective Assistance of Counsel on Appeal

Petitioner contends in claim four that he received ineffective assistance of counsel on appeal because his appellate counsel did not raise the aforementioned ineffective assistance of trial counsel claims on appeal.  (ECF No. 1 at 57-58).

### 1. State Court Opinion

Petitioner raised claim four in his petitions to the state superior, appellate, and supreme courts.  (ECF Nos. 16-43, 16-45, 16-47).  Both the superior and appellate courts denied Petitioner's claim on the merits.  (ECF

Nos. 16-33, 16-46).  The California Supreme Court denied the petition without comment or citation to authority.  (ECF No. 16-48).  Accordingly, this Court must "look through" to the state appellate court's order denying the claim as the basis for authority.  *Ylst*, 501 U.S. at 805-06.  After analyzing Petitioner's ineffective assistance of trial counsel claim, that court wrote:

> Finally, Gutierrez claims his appellate counsel was ineffective for failing to raise these same issues on direct appeal.  As discussed above, the claims are not meritorious such that any failure to raise these issues could not have prejudiced Gutierrez.

(ECF No. 16-46 at 2).

## 2. Summary of Arguments

Petitioner contends that he received ineffective assistance of counsel on appeal because his appellate counsel did not raise the aforementioned ineffective assistance of trial counsel claims.  (ECF No. 1 at 57-58).

Respondent contends the state court's rejection of this claim was in accord with and a reasonable application of clearly established federal law, and should be denied.  (ECF No. 15-1 at 29).  Respondent argues appellate counsel could not have been ineffective for failing to raise the complained-of issues on appeal because trial counsel was not ineffective.  (*Id.*).

## 3. Legal Standard

"[T]o determine whether appellate counsel's failure to raise these claims was objectively unreasonable and prejudicial, we must first assess the merits of the underlying claims that trial counsel provided constitutionally deficient representation."  *Moormann v. Ryan*, 628 F.3d 1102, 1106-1107 (9th Cir. 2010).  "If trial counsel's performance was not objectively unreasonable or did not prejudice [Petitioner], then appellate counsel did not act unreasonably in failing to raise a meritless claim of ineffective assistance of counsel, and [Petitioner] was not prejudiced by appellate counsel's omission."  *Moormann*,

628 F.3d at 1107.

## 4. Analysis

As discussed above, trial counsel's performance did not prejudice Petitioner. As such, appellate counsel did not act unreasonably in failing to raise a meritless claim of ineffective assistance of counsel, and Petitioner was not prejudiced by appellate counsel's omission. Therefore, because Petitioner failed to establish the prejudice prong under the *Strickland* test, the state court's application of clearly established federal law was not objectively unreasonable.

Accordingly, the Court **RECOMMENDS** claim four be **DENIED**.

## E. Evidentiary Hearing

Petitioner requests an evidentiary hearing. (ECF No. 1 at 15). Petitioner argues an evidentiary hearing is required to explore the issues in this instant petition and failure to order an evidentiary hearing will result in a miscarriage of justice. (*Id.*). Petitioner contends the hearing is needed to explore the facts and determine if his conviction was obtained through constitutional violations. (ECF No. 21 at 12).

Respondent argues Petitioner's demand for an evidentiary hearing should be denied because Petitioner has not identified what facts are in dispute that an evidentiary hearing would resolve. (ECF No. 15-1 at 29).

## 1. Legal Standard

A federal court's discretion to hold an evidentiary hearing is governed by 28 U.S.C. § 2254(e)(2), which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
> (A) The claim relies on –
>     (i)     a new rule of constitutional law, made retroactive to cases on

collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

"Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. 420, 437 (2000).

## 2. Analysis

Petitioner does not establish that his request relies on a new rule of constitutional law, or a factual predicate that could not have been previously discovered through due diligence. Similarly, Petitioner has not alleged facts that would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense.

Accordingly, the Court **RECOMMENDS** Petitioner's request for an evidentiary hearing be **DENIED**.

## V. <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation, (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that no later than **<u>February 23, 2018</u>**, any party to this action may file written objections with this Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **March 2, 2018**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Dated:   January 24, 2018

Hon. Mitchell D. Dembin
United States Magistrate Judge

Case No.:  17-cv-00438-MMA-MDD